FILED
2015 Oct-16  AM 09:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **VALERIE WALLACE,** <br> **individually and on behalf of all** <br> **others similarly situated,** | ) <br> ) <br> ) <br> ) | |
| **Plaintiff,** | ) <br> ) | _____ |
| **v.** | ) | **CLASS ACTION** |
| | ) | |
| **VOLKSWAGEN GROUP OF** <br> **AMERICA, INC., VOLKSWAGEN AG** <br> **and ROBERT BOSCH GMBH INC.,** | ) <br> ) <br> ) | |
| **Defendants.** | ) <br> ) | |

## COMPLAINT

## I.       INTRODUCTION

Plaintiff Valerie Wallace ("Plaintiff"), by her undersigned counsel, individually and on behalf of all others similarly situated, allege the following against Volkswagen Group of America, Inc. ("VW USA") and Volkswagen AG ("VW AG") (together, VW USA and VW AG are referred to as "Volkswagen"), and Robert Bosch GmbH ("Bosch") (collectively, VW USA, VW AG and Bosch are referred to as "Defendants"), based, as to themselves, on personal knowledge, and on information and belief in all other respects, based on the investigation of counsel.  This Court has jurisdiction over this action pursuant to the Class Action

Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) and based on a federal question, 28

U.S.C. § 1331

## II.      NATURE OF THE ACTION

1.      This nationwide civil RICO, false advertising and consumer fraud

class action concerns the intentional installation of so-called "defeat devices" on

over 482,000 diesel Volkswagen and Audi vehicles sold in the United States since

2009.  As of September 29, 2015, Volkswagen admitted that the emissions scandal

could affect as many as 11 million Volkswagen vehicles worldwide, as well as an

additional 2.1 million Audi-branded vehicles.   Over the last seven years,

Volkswagen has pocketed $33 billion or more in illicit profits from its scheme.

2.      Volkswagen marketed those vehicles as environmentally-friendly cars

that combined extremely high fuel efficiency and performance with very low

emissions.  Volkswagen touted the vehicles as containing a unique combustion

system that enabled them to meet (indeed, exceed) national emission standards on

a cost-effective basis and without the need to add an additional chemical that was

necessary to add in all other diesel systems in order to meet emissions standards.

3.      Although Volkswagen successfully marketed and sold almost 500,000

of these expensive cars nationwide as "green," Volkswagen has now publicly

admitted that their environmentally-friendly representations were false.

Volkswagen did not actually manufacture or sell cars with the desirable attributes

advertised.  Volkswagen's entire "CleanDiesel" system and marketing campaign was a fraud.

4.    The United States government, through the Environmental Protection Agency ("EPA"), has passed and enforced laws designed to protect United States citizens from pollution and, in particular, certain chemicals and agents known to cause disease in humans.  Automobile manufacturers must abide by these laws, and must adhere to EPA rules and regulations.

5.    Volkswagen purposefully and intentionally breached these laws and regulations by manufacturing and then selling in the United States vehicles that made use of "defeat devices," which included computer software that was designed to "cheat" during emissions tests to make it appear as if the vehicles achieved certain low emissions levels that the vehicles did not in fact achieve while they were being driven.  If the emissions tests reported the emissions levels the vehicles actually achieved while being driven, each vehicle tested would have failed the emissions test abysmally.

6.    As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA, in a September 18, 2015 press release:  "Using a defeat device in cars to evade clean air standards is illegal and a threat to public health."

7.      According to the EPA, Volkswagen installed a "defeat device" in at least the following diesel models of its vehicles (the "Affected Vehicles"):  Model Year ("MY") 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-2015 VW Passat; and MY 2009-2015 Audi A3. Volkswagen's Audi unit has now reported that Audi A4 sedans and Q5 sports utility vehicles are also Affected Vehicles.  Investigations are currently under way to determine whether the Volkswagen installed the device in additional models, so discovery may reveal that additional vehicle models and/or model years are properly included as Affected Vehicles.  As new facts are discovered, additional vehicle models and/or model years may be added to this list.

8.      Instead of delivering on its promise of extremely high fuel mileage coupled with low emissions, Volkswagen devised a way to make it appear that its cars complied with EPA regulations when, in fact, they did not.  As detailed in the EPA's Notice of Violation ("NOV"), sophisticated software in the Affected Vehicles detects when the vehicle is undergoing official emissions testing, and turns full emissions controls on for the purposes of such tests.  In all other circumstances, however, the emissions controls are suppressed.  This results in cars that meet emissions standards in the laboratory or state testing station but, at all other times when the vehicle is running, emit nitrogen oxides ("NOx") at up to forty (40) times the standard allowed under United States laws and regulations.

This software, as produced and used by Volkswagen, is a "defeat device" as defined by the Clean Air Act.

9.     NOx pollution contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter.  Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital.  Ozone and particulate matter exposure, in particular, have been associated with premature death due to respiratory-related or cardiovascular-related consequences.  Children, the elderly, and people with pre-existing respiratory illness are at acute risk of negative health effects from these pollutants.

10.     According to a working paper by three researchers affiliated with the National Bureau of Economic Research concluded that reduced NOx emissions that resulted from new power plant regulations resulted in about five fewer deaths for every 100,000 people each year, as well as a decrease in spending on prescription drugs.  Extrapolating from that research, the estimated 46,000 tons of extra NOx emissions from Volkswagen's TDI vehicles in the U.S. since 2008 has caused 106 deaths in the U.S.  Another researcher, at the Massachusetts Institute of Technology, using EPA data on mortality rates stemming from particulate pollutants produced by NOx, concluded that the number of deaths attributable to Volkswagen's deception could be as high as 146 people.  That number does not

include the direct effects of NOx pollution or smog, and it does not include the number of people who suffer from non-fatal health consequences of the extra NOx related pollutants that flooded the air due to Volkswagen's heinous scheme.

11.    The Clean Air Act has strict emissions standards for vehicles, and requires that vehicle manufacturers certify to the EPA that vehicles sold in the United States meet applicable federal emissions standards meant to control air pollution.  Every vehicle sold in the United States must be covered by an EPA-issued certificate of conformity.  Under federal law, cars equipped with defeat devices, which reduce the effectiveness of emissions control systems during normal driving conditions, cannot be certified by the EPA.  By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than the EPA permits, and certifying to the EPA that such vehicles were compliant with the Clean Air Act, Volkswagen violated the Clean Air Act, defrauded its customers, and engaged in unfair competition under state and federal law.

12.    Volkswagen has charged a substantial premium for the Affected Vehicles, which are paradoxically marketed by Volkswagen as "CleanDiesel" vehicles.  For example, the base S model of the 2015 Volkswagen Jetta has a starting MSRP of $18,780.  The base TDI S CleanDiesel, however, has a starting MSRP of $21,640, a price premium of $2,860.  The CleanDiesel premium for the highest model Jetta is even more significant.  The highest level gas Jetta SE has a

starting MSRP of $20,095, while the CleanDiesel TDI SEL MSRP is $26,410. Thus, a consumer who purchased the highest model of the CleanDiesel Jetta would be paying a $6,315 premium for a benefit that he or she was not actually receiving.

13.    Similar premiums arise across all of the vehicles in which Volkswagen installed its "defeat device" for emissions testing.  Premiums across the affected vehicles range from approximately $1,000 to nearly $7,000.

14.    Volkswagen has been ordered by the EPA to recall the Affected Vehicles and perform repairs that will ensure that the vehicles comply with EPA emissions requirements at all times during normal operation.  Volkswagen will not be able to make the Affected Vehicles comply with emissions standards, however, without substantially downgrading their performance characteristics, including their horsepower and their efficiency.  As a result, even if Volkswagen is able to make the Affected Vehicles EPA-compliant, Class members will still suffer actual harm and damages, as their vehicles will no longer perform as they did when purchased and as advertised.  This will necessarily result in a diminution of value of every Affected Vehicle, and it will cause owners of Affected Vehicles to pay more for fuel when using the cars subsequent to the repairs.

15.    Volkswagen's fraudulent scheme was facilitated and aided and abetted by Defendant Bosch, which created the software program used in Volkswagen's defeat device.  As early as 2007, Bosch warned Volkswagen that using its software

in vehicles that were driven on the road would constitute a criminal offense. Nevertheless, Bosch proceeded to sell or license 11,000,000 of the component devices to Volkswagen over the next seven years knowing that Volkswagen intended to use them in production vehicles.   Instead of refusing to provide Volkswagen with the defeat devices that Bosch knew would enable Volkswagen to engage in criminal fraud, Bosch decided instead to profit from Volkswagen's fraud by selling the 11,000,000 units.   Under American law, that decision to profit from what Bosch knew was Volkswagen's ongoing fraud makes Bosch and aider and abettor of that crime and a RICO co-conspirator with Volkswagen that is jointly liable for treble the damages that Volkswagen's fraud has caused U.S. consumers.

16.    As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices and the Bosch-Volkswagen RICO conspiracy, and Volkswagen's failure to disclose that, under normal operating conditions, the Affected Vehicles emit up to forty (40) times the allowed levels of pollution, owners and lessees of the Affected Vehicles have suffered losses in money and/or property.

17.    Had Plaintiff and the other Class members known of the presence of the "defeat device" at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or they would have paid substantially less for the Affected Vehicles than they did.   Moreover, when

Volkswagen recalls the Affected Vehicles in order to make them compliant with EPA standards, Plaintiff and Class members will be required to spend additional money on fuel and will not obtain the performance that was characteristic of their vehicles at the time of purchase. The Affected Vehicles will necessarily be worth less in the marketplace because of this decreased performance and efficiency.

### III.   PARTIES

18.   Plaintiff Valerie Wallace is an individual residing in Owens Cross Roads, Alabama.

19.   Plaintiff purchased a 2014 Volkswagen Jetta TDi Value Edition on December 6, 2014 from Hiley Volkswagen in Huntsville, Alabama. Plaintiff still owns the car.

20.   Plaintiff purchased the car specifically for its high performance, fuel efficiency and "Clean Diesel" technology.

21.   On September 18, 2015, Plaintiff first learned of Volkswagen scheme to defraud the Environmental Protection Agency and that her car does not, in fact, meet all regulatory requirements as she had previously understood. After news of the emissions scandal broke, Plaintiff felt deceived, frustrated and violated. Not only has the value of her property decreased dramatically, but also the Volkswagen brand as a whole has been entirely tarnished in Plaintiff's mind.

22.    Defendant Volkswagen USA is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.  Volkswagen does business in every state and the District of Columbia, but is a citizen of New Jersey and Virginia pursuant to 28 U.S.C. § 1332(d)(10).

23.    Defendant Volkswagen Aktiengesellschaft, doing business as Volkswagen Group and/or Volkswagen AG, is a corporation organized and existing under the laws of Germany, with its principal place of business located in Wolfsburg, Germany.  Volkswagen AG is the parent corporation of Volkswagen USA.

24.    Defendant Robert Bosch GmbH ("Bosch") is a German multinational engineering and electronics company, headquartered in Stuttgart Germany.  At all times from at least January 1, 2007 through the present, Bosch supplied the defeat device to Volkswagen.

25.    At all times from January 1, 2008 through the present (the "Relevant Period"), Volkswagen manufactured, distributed, sold, leased, and warranted the Affected Vehicles under the Volkswagen and Audi brand names throughout the United States.  Volkswagen and/or its agents designed, manufactured, and installed the "CleanDiesel" engines and engine control systems, including the "defeat device," in the Affected Vehicles.  Volkswagen also developed and disseminated

the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

## IV.    JURISDICTION AND VENUE

26.    This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are at least 100 members of the proposed class, at least one of whom is a citizen of a different state than Defendants, and the aggregate claims of the proposed class members exceed five million dollars ($5,000,000.00), exclusive of interest and costs.  This Court also has Federal Question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

27.    This Court has personal jurisdiction over Volkswagen USA because Volkswagen USA is incorporated in this jurisdiction.  The Court has personal jurisdiction over Volkswagen AG and Bosch because both of these Defendants have conducted and continue to conduct substantial business in this jurisdiction, and because these Defendants have conspired to commit and have committed the fraudulent acts and omissions complaint of herein in this District and have directed their illegal acts against citizens of Alabama and caused damages to those Alabama citizens.

28.    Venue is proper in this District under 28 U.S.C. § 1391 because Volkswagen USA is a resident of the District of Northern District of Alabama by

virtue of being incorporated in this jurisdiction, because both Volkswagen Defendants sell a substantial amount of automobiles in this District and have dealerships in this District, and because many of all three Defendants' acts complained of herein occurred within this District.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

29.    The tolling doctrine was designed specifically for cases like this, where pertinent facts were concealed from Plaintiff.  Thus, for the following reasons, any statutes of limitations that might have otherwise applied have been tolled by the discovery rule with respect to all claims.

30.    Even through the exercise of reasonable diligence, Plaintiff and other members of the Class could not have discovered, within any applicable statute of limitations, that Volkswagen was concealing and misrepresenting the true emissions levels of its vehicles or that Volkswagen was using defeat devices to bypass the EPA's emissions requirements.

31.    As reported in *The Wall Street Journal* on September 18, 2015, the International Council on Clean Transportation, together with researchers from West Virginia University, uncovered Volkswagen's use of defeat devices during comprehensive research and testing over the last couple of years.  The International Council on Clean Transportation brought the issues to the attention of the EPA,

which conducted further tests and ultimately discovered these "very serious" violations by Volkswagen. As defect devices were even used to "fool[] the emissions tests," Volkswagen's deception with respect to the Affected Vehicles was carefully concealed from both regulators and consumers.

32.   Plaintiff and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Volkswagen intentionally failed to report information within its knowledge to federal and state authorities, its dealerships, and its consumers.

33.   Moreover, a reasonable and diligent investigation could not have disclosed that Volkswagen had information in its sole possession about the existence of its sophisticated emissions deception and that it had concealed that information, which was discovered by each Plaintiff only very shortly before this action was filed. Plaintiff and other Class members could not have previously learned that Volkswagen valued profits over compliance with applicable federal and state emissions regulations and consumer law.

**B.    Fraudulent Concealment Tolling**

34.   Throughout the Relevant Period, all applicable statutes of limitations have been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged in this Complaint.

35.    Instead of disclosing its fraudulent emissions scheme, or that the emissions from the Affected  Vehicles were far worse than had been represented, Volkswagen falsely represented to consumers and regulators that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

**C.     Estoppel**

36.    Volkswagen was under a continuous duty to disclose to Plaintiff and the other members of the Class the facts that it knew about the emissions from the Affected Vehicles, as well as information regarding the Affected Vehicles' failure to comply with federal and state laws.

37.    Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the Affected Vehicles.

38.    Although Volkswagen had a duty, throughout the Relevant Period, to disclose to Plaintiff and the Class that it had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Affected Vehicles.  Furthermore, Volkswagen intentionally misrepresented its blatant and deceptive lack of compliance with state law regulating vehicle emissions and clean air.

39.     Thus, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## VI.     FACTUAL ALLEGATIONS

40.     Volkswagen intentionally designed and sold cars that misled both consumers and regulators about the amount of pollution those cars created and the fuel efficiency they produced.

41.     Despite touting themselves as environmentally-conscious companies that produced thoughtful cars for people who cared about the environment, Volkswagen knowingly and deliberately sold cars at greatly marked up prices that produced pollution at up to forty (40) times the magnitude allowed by federal and state regulations.

42.     Simultaneously, while Volkswagen was promoting itself as being environmentally-aware, Volkswagen intentionally and knowingly concealed the truth about the fuel efficiency and emissions of the Affected Vehicles.

**A.     Volkswagen Promotes their CleanDiesel Vehicles as Being Fuel Efficient and Environmentally-Friendly**

43.     For years, Volkswagen has advertised its diesel vehicles as low-emission, fuel-efficient cars.  Indeed, this marketing message is at the core of Volkswagen's image in the United States, stimulating a successful advertising campaign that has led Volkswagen to become the largest seller of diesel passenger vehicles in the country.

44.     Volkswagen's success is based, in large part, on promotion of its diesel cars as "clean" and "green" vehicles.  In fact, Volkswagen has promoted the Affected Vehicles under the name "CleanDiesel."  Promotions of the CleanDiesel vehicles have centered on the alleged high fuel efficiency and "clean" engine of these vehicles.

45.     Volkswagen touts its ostensible concern for the environment through means other than the names and purported attributes of its vehicles.  For example, on the Volkswagen USA website, Volkswagen places an emphasis on its commitment to environmental sustainability, stating that this is "at the core of [its] operating philosophy."   Volkswagen states that it does not just talk about environmental sustainability, but rather the company "take[s] action, finding inventive ways to be responsible in everything [it] do[es]."

46.     Volkswagen even states that it "take[s] steps to ensure that every vehicle [it] manufacture[s] is the best it can be in terms of its environmental properties."   Notwithstanding these representations, Volkswagen was knowingly hiding its failure to even meet minimum emissions standards.

47.     Volkswagen further bolsters its claims to be concerned for the environment by promoting the fact that the Audi A3 TDI and VW Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year, respectively.

48.    Volkswagen also launched the "Think Blue" initiative, which the company explains is intended to help the company become the world's most ecologically sustainable car manufacturer by 2018.   As part of this initiative, Volkswagen claims, among other things, that it intends "to reduce the environmental burden produced by each vehicle and each component in production by 25% from 2010 to 2018" and that each "new Volkswagen should be at least 10% more efficient than its predecessor."

49.    Beyond merely advertising its vehicles, Volkswagen supported and directed a website – *www.clearlybetterdiesel.org* – to promote their "clean" diesel technology.   According to this website, Volkswagen's diesel technology reduces smog and "meets the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

50.    Volkswagen goes so far as to use the tagline "Truth in Engineering" to promote its Audi brand.

51.    Unfortunately for consumers who paid Volkswagen's significant premiums to purchase "green" cars – and people who breathe the air into which the Affected Vehicles emit egregious amounts of pollutants – Volkswagen was far from truthful in promoting their CleanDiesel vehicles.   Rather than promoting "environmentally conscious lifestyles," Volkswagen designed and sold cars that

emit pollutants at extraordinary levels, failing state and federal environmental regulations by breathtaking margins.

**B.    Volkswagen Intentionally and Systematically Concealed the Excessive and Illegal Levels of Pollution Emitted by its Vehicles**

52.    Contrary to Volkswagen's representations that it is a "green" company committed to promoting the "greater good," its CleanDiesel cars produce illegal and unhealthy levels of pollution.

53.    On September 18, 2015, the EPA issued a Notice of Violation ("NOV") to Volkswagen.   The NOV explains that Volkswagen installed sophisticated software in the Affected Vehicles.  This software detects when the vehicle is undergoing official emissions testing, and turns on full emissions controls *only* during that test.   At all other times that the vehicle is running, however, the emissions controls are deactivated, meaning that pollution is freely released into the environment at levels that far exceed those allowed by federal and state clean air regulators.  As defined by the Clean Air Act, the software produced and used by Volkswagen to falsify emissions testing results is a "defeat device."

54.    Moreover, the NOV issued by the EPA alleges that Volkswagen knew or should have known that these defeat devices would "render inoperative elements of the vehicle design related to compliance with…emissions standards," because of "the design of these defeat devices."  The software was specifically designed to "track the parameters of the federal test procedure and cause emission control

systems to underperform when the software determined that the vehicle was not undergoing the federal test procedure."

55.     Most modern engines, including Volkswagen's CleanDiesel engines, use computerized engine control systems to monitor sensors throughout a car's engine and exhaust systems and control operation of the car's systems to ensure optimal performance and efficiency.  These functions can include controlling fuel injection, valve and ignition timing and, as in Volkswagen's CleanDiesel engines, operating the engine's turbocharger.  The engine control computer can, for example, ensure that the air-to-fuel mixture is correct, based on sensor readings such as throttle position, amount of air flowing into the engine, and engine temperature.

56.     Engine control computers also receive data from sensors in the car's exhaust system, which measure the amounts of chemical substances included in the car's exhaust.  This data provides a measure of the engine's operation and efficiency, and is thus used by the engine control computer in operating the car's systems to ensure the desired performance and efficiency.

57.     The ability of modern cars to use these sophisticated computers and sensors throughout the car's systems allows emissions testing to make use of a car's existing sensors to measure the presence of pollutants and track compliance with EPA and state emissions standards.  Emissions testing stations, for example,

plug a diagnostic device into the car's on-board diagnostics ("OBD II") port, and use the car's exhaust sensors during the testing procedure, in order to measure the substances emitted. Some states, instead of or in addition to an OBD II diagnostic device, use a measurement probe inserted into the car's exhaust pipe to measure the chemicals emitted by the vehicle.

58. Volkswagen programmed the engine control computers in the Affected Vehicles with software that first detects when the cars are undergoing emissions testing, and then operates the car's engine and exhaust systems to fool the test. Only when the vehicle is undergoing emissions testing will the engine control computers in the Affected Vehicles ensure that emissions comply with EPA pollution standards. When the car is not undergoing emissions testing (*i.e.*, when it is being used by consumers), the engine control systems operate the vehicle in a manner that does not comply with EPA emissions requirements.

59. Essentially, the defeat device software used by Defendants allows Defendants' CleanDiesel vehicles to meet emissions standards in labs or state testing stations, while permitting the vehicles to emit NOx at up to forty (40) times the standard allowed under United States laws and regulations during normal operation of the vehicles. NOx pollution contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter. Exposure to such pollutants can lead to hospitalization for various serious respiratory illnesses, as well as premature death

due to respiratory-related or cardiovascular-related effects.  Children, the elderly, and people with pre-existing respiratory illnesses are particularly at risk. Researchers have estimated that the extra 46,000 tons of NOx that Volkswagen's Affected Vehicles have spewed into the atmosphere in the U.S. since 2008 has cause 106 to 146 or more deaths in the U.S.

60.     Due to the serious health risks posed by such pollutants, the Clean Air Act obligates vehicle manufacturers to comply with strict emissions standards, and to certify to the EPA that all vehicles sold in the United States meet applicable federal emissions standards to control air pollution.  In fact, every vehicle sold in the United States must be covered by a certificate of conformity issued by the EPA.  Under federal law, cars equipped with defeat devices, which reduce the effectiveness of emissions control systems during normal driving conditions, cannot be certified.

61.     By manufacturing, promoting, and selling cars with defeat devices that enabled the Affected Vehicles to pass emissions tests before shutting down and releasing exorbitant levels of pollutants into the air, Volkswagen violated the Clean Air Act, misled regulators, defrauded its customers, and engaged in unfair competition under state and federal laws.

62.     In fact, Volkswagen AG's top United States executive, Michael Horn, admitted that the "company was dishonest with the EPA and the California Air

Resources board, and with all of you," and that the company had "totally screwed

up." In spite of that admission, Horn protested that "[t]his kind of behavior is

totally inconsistent with [Volkswagen's] qualities."

63.    According to *The New York Times*, however, Volkswagen executives

admitted that the CleanDiesel "vehicles it sold in the United States Used software

meant to cheat on the [emissions] tests" only ***after*** the EPA "took the extraordinary

action of threatening to withhold approval for the company's 2016 Volkswagen

and Audi diesel models."

64.    Bosch supplied Volkswagen with the software used in the defeat

device and sold or licensed 11,000,000 units of its component device to

Volkswagen knowing that Volkswagen intended to install them in its production

line TDI vehicles and to sell them to consumers in America and elsewhere around

the world. Bosch, thereby, knew it was facilitating and assisting Volkswagen in

what Bosch itself identified as early as 2007 would be a criminal fraud.

65.    According to German and French newspaper reports, a team currently

conducting a Volkswagen internal review of the scandal uncovered a 2007 letter

from Bosch to Volkswagen in which Bosch warning that using its software in

production vehicles would constitute an "offense." Nevertheless, Bosch proceeded

to deliver 11,000,000 units of its defeat device to Volkswagen knowing that

Volkswagen intended to commit the very "offense" Bosch had warned of, and Bosch profited handsomely from its sales to Volkswagen.

66.    In a September 24, 2015 press release, Bosch admitted that it had "supplied the common-rail injection system as well as the supply and dosing module for exhaust-gas treatment," but it attempted to distance itself from Volkswagen fraud by claiming that "Bosch supplie[d] these components to the automaker's specifications" and that "[h]ow these components [were] calibrated and integrated into complete vehicle systems is the responsibility of each automaker."  Bosch's "hear no evil, see no evil" rationale for knowingly profiting from Volkswagen's crimes does not enable Bosch to escape civil liability under American law.  Bosch knew Volkswagen intended unlawfully to use its defeat device software in production vehicles.  Instead of preventing that fraud by refusing to sell the devices to Volkswagen under those circumstances, Bosch elected to facilitate and profit from Volkswagen's fraud.  Accordingly, Bosch is just as responsible for the harm Volkswagen has caused as Volkswagen itself.

67.    By continuing to sell millions of the defeat devices to Volkswagen, Bosch knew it was aiding and abetting criminal fraud and wire fraud in the United States, and it knowingly participated in a RICO conspiracy.

**C.    Defendants Have Profited Enormously from their CleanDiesel Vehicles**

68.    Volkswagen charges substantial premiums for the Affected Vehicles. For example, the starting MSRP for the base model of the Volkswagen Passat with a gasoline engine is $21,340.  In order to purchase the base model of a Volkswagen Passat that is outfitted with a CleanDiesel engine, however, an individual would need to spend a minimum of $27,095 – a $5,755 premium over the base price of the comparable gasoline engine model.  Consumers are willing to pay this 27% premium because they believe they are driving a vehicle that is EPA-compliant and environmentally-friendly, but this is not the case with the Affected Vehicles.

69.    These premiums occur across all of the vehicles in which Defendants installed a defeat device for emissions testing.  As an example, the table below sets forth the price premium of a base CleanDiesel model as opposed to a comparable base model with a gasoline engine, both as a percentage and in terms of dollar value.  These premiums are based on the starting MSRP for the base model of each type of Affected Vehicle and its non-CleanDiesel counterpart.

| Model | Base Model MSRP | CleanDiesel Base Model MSRP | Premium (%) | Premium ($) |
|---|---|---|---|---|
| VW Jetta | $18,780 | $21,640 | 15% | $2,860 |
| VW Beetle | $20,695 | $25,330 | 22% | $4,635 |
| VW Golf | $20,175 | $22,575 | 19% | $2,400 |
| VW Passat | $21,340 | $27,095 | 27% | $5,755 |
| Audi  A3 | $30,900 | $33,200 | 7% | $2,300 |

70.    Even higher premiums were charged with respect to many non-base models of the Affected Vehicles.  The highest level gas Jetta SE has a starting MSRP of $20,095, while the CleanDiesel TDI SEL MSRP is $26,410, a $6,315 premium.  Premiums across the Affected Vehicles ranged from approximately $1,000 to nearly $7,000.

71.    Making the conservative assumption that the average premium charged for the 11,000,000 Affected Vehicles sold worldwide was $3000, Volkswagen's fraud yielded $33,000,000,000 in excess illicit profits to Volkswagen.  That estimate assumes also that every Volkswagen TDI purchaser would have bought another Volkswagen model if the truth about the CleanDiesel TDI models were known at the time of sale.  The estimate does not include additional profits that Volkswagen earned by drawing market share away from its competitors via consumers who were deceived into buying a Volkswagen or Audi TDI model rather than a gasoline or diesel model offered by a competitor.

72.    Bosch earned excess illicit profits by selling or licensing to Volkswagen 11,000,000 units of the defeat device component that it would not have sold but for Volkswagen's fraud, and which Bosch should not have sold given it knew that Volkswagen intended to commit fraud by installing those component units into production line vehicles that would be sold to the public.

**D.      Defendants' Illegal Actions Have Caused Plaintiff and the Class Significant Harm**

73.     Although the EPA has ordered Volkswagen to recall the Affected Vehicles and repair them so that they comply with EPA emissions requirements at all times, purchasers of the Affected Vehicles have suffered and will continue to suffer significant harm as a result of Defendants' illegal acts.

74.     First, Volkswagen will not be able to make the Affected Vehicles comply with emissions standards without substantially degrading the performance characteristics Volkswagen promoted to consumers.   As a result, even if Volkswagen is able to make the Affected Vehicles EPA-compliant, Class members will continue to suffer actual harm and damages because their vehicles will no longer perform as they did when they were purchased and as advertised.

75.     Second, even if Volkswagen is able to make the Affected Vehicles compliant with EPA emissions standards, the recall remedy will necessarily result in a diminution in the value of each Affected Vehicle.   Not only did Class members pay significant premiums for cars that are not equipped as advertised, but also Plaintiff and other members of the Class will end up paying more to fuel their less-efficient cars if they continue to drive them after any recall repairs are performed.

76.     In fact, according to *The New York Times*, Volkswagen has said that it will be "setting aside the equivalent of half a year's profits – 6.5 billion euros, or

about $7.3 billion – to cover the cost of fixing the cars to comply with pollution standards and to cover other expenses, which are likely to include fines as well as responses to civil lawsuits from angry customers." Even Volkswagen's beleaguered former Chief Executive Officer, Martin Winterkorn, referred to the way in which the company deceived consumers and regulators as "manipulation." Winterkorn has already announced his resignation due to the scandal.

77. As a result of Volkswagen's unfair, deceptive, and fraudulent business practices, and its failure to disclose that the Affected Vehicles typically emit up to forty (40) times the permissible levels of pollutants, and as a result of Bosch's facilitation of Volkswagen's fraud, Class members have suffered losses in money and/or property.

78. Had Plaintiff and other members of the Class known of the presence of the defeat device at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less than they did for those vehicles.

79. Moreover, when Volkswagen recalls the Affected Vehicles and repairs the CleanDiesel engine performance in order to make the Affected Vehicles complaint with EPA emissions standards, Plaintiff and Class members will be required to spend more on fuel and will no longer benefit from the performance qualities of their vehicles as advertised. As a result of this necessary decrease in

performance and efficiency, the Affected Vehicles will be worth less in the marketplace for used vehicles, so Plaintiff and other members of the Class will not be able to recoup nearly as much for their vehicles when they ultimately attempt to sell them or trade them in.

80.    In order to achieve the drastic drop in NOx emissions required for the Affected Vehicles to comply with EPA regulations, the cars will have to sacrifice some fuel economy, or performance.   In addition to a drop in gas mileage, attempting to make the Affected Vehicles EPA-compliant will also likely require some drop in torque, which allows diesel vehicles to really accelerate off the line – one of the features owners of diesel vehicles value most.

81.    An alternative to recalibrating the defeat device software so that the Affected Vehicles always run the way they do during EPA testing is to add a urea tank to the Affected Vehicles.   The standard way of making diesel vehicles run cleanly is to use selective catalytic reduction, a chemical process that breaks NOx down into nitrogen and water.   Part of this process, which is used by other diesel manufacturers like Mercedes and BMW, involves adding urea to the mix.   While this system is incredibly effective in that it can eliminate between seventy and ninety percent of NOx emissions, it adds both complication and cost to the equation.   The system costs between $5,000 and $8,000 per car, and consumers need to periodically add the urea-based solution to their vehicles in order to keep

them running.  In addition, making room for the urea tank could mean sacrificing cargo space or giving up the spare tire.

82.    Volkswagen's fraudulent scheme to conceal substantial defects in the Affected Vehicles placed profit over the safety of their customers and the health of the environment, causing serious harm to consumers nationwide.

83.    While the Chief Executive Officer of Volkswagen, who resigned on September 23, 2015 in the wake of the scandal, has apologized for breaking the trust of the company's customers and the public, such candor after years of misrepresentations and omissions of material information is presumptively a public relations effort at damage control and insincere, and it does not compensate Plaintiff and other members of the Class for the damages they have incurred as a result of Defendants' illegal actions.

84.    The United States Department of Justice will conduct a criminal investigation into Volkswagen after the company admitted to developing software that allowed its diesel cars to circumvent emissions testing, in violation of the Clean Air Act.  The New York State Attorney General, in collaboration with state attorneys general throughout the country, will also investigate Volkswagen's attempts to evade environmental protection laws and its practice of "promis[ing] consumers a fake bill of goods."  According to a *USA Today* editorial, "[t]he simple word for the accusation against VW is cheating, and on a grand scale."

## VII.      CLASS ACTION ALLEGATIONS

85.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively, the "Class" or "Classes"):

**The Nationwide Class**

All persons or entities in the United States who are current or former owners and/or lessees of an "Affected Vehicle." Affected Vehicles include, without limitation: MY 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-2015 VW Passat; and MY 2009-2015 Audi A3.

**The Alabama Subclass**

All persons or entities in the State of Alabama who are current or former owners and/or lessees of an "Affected Vehicle." Affected Vehicles include, without limitation: MY 2009-2015 VW Jetta; MY 2009-2015 VW Beetle; MY 2009-2015 VW Golf; MY 2014-2015 VW Passat; and MY 2009-2015 Audi A3.

86.    Excluded from the Class are individuals who have personal injury claims resulting from the use of the defeat device in the CleanDiesel system. Also excluded from the Class are employees or agents of Defendants and their subsidiaries and affiliates, all persons who make a timely request to be excluded

from the Class, all governmental entities, and the judge to whom this case is assigned and his or her immediate family.  Plaintiff reserve the right to revise the Class definition based upon information learned through discovery.

87.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

88.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

89.   The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believes that there are not less than hundreds of thousands of members of the Classes, the precise number of Class members is unknown to Plaintiff at this time, but may be ascertained from Volkswagen's records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

90.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)  Whether Defendants engaged in the conduct alleged herein;

(b)  Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

(c)  Whether the CleanDiesel engine system in the Affected Vehicles contains a defect in that it does not comply with EPA requirements;

(d)  Whether the CleanDiesel engine systems in the Affected Vehicles can be made to comply with EPA standards without substantially downgrading the performance and/or efficiency of the Affected Vehicles;

(e)  Whether Defendants knew about the "defeat device" and, if so, for how long;

(f)  Whether Volkswagen designed, manufactured, marketed, and distributed Affected Vehicles with a "defeat device;"

(g)  Whether Defendants' conduct violates RICO, consumer protection statutes, warranty laws, and other laws asserted herein;

(h)  Whether Plaintiff and the other members of the Classes overpaid for their Affected Vehicles;

(i)  Whether Plaintiff and the other members of the Classes are entitled to equitable relief including, but not limited to, restitution or injunctive relief; and

(j)  Whether Plaintiff and the other members of the Classes are entitled to treble damages and other monetary relief and, if so, in what amount.

91.   Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the wrongful conduct of Volkswagen, as described above.

92.   Plaintiff is adequate Class representative because her interests do not conflict with the interests of the other members of the Classes she seeks to represent.  Furthermore, Plaintiff has retained counsel competent and experienced in complex class action litigation.  The Classes' interests will be fairly and adequately protected by Plaintiff, who intends to prosecute this action vigorously, and by Plaintiff' skilled and experienced counsel.

93.   Volkswagen has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to the Class as a whole.

94.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually

litigate their claims against Volkswagen, so it would be impracticable for members of the Classes to individually seek redress for Volkswagen's wrongful conduct.

95.    Even if Class members could afford individual litigation, the court system could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system.    By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.    CAUSES OF ACTION

### A.    Claims Brought on Behalf of the Nationwide Class

### COUNT I
### Violation of The Racketeer Influenced And Corrupt Organizations Act ("RICO")
### (18 U.S.C. § 1962(c))

96.    Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

97.    The Defendants are all "persons" under 18 U.S.C. § 1961(3).

98.    The Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the RICO Enterprise through a pattern of repeatedly defrauding consumers.   The methodology of the fraud is set forth above and as described in this Count.   The persons participating in the Enterprise and their respective roles in the Enterprise are set forth below.

99.     This Count is asserted by Plaintiff on behalf of the Nationwide Class and the Alabama Subclass.

100.  For purposes of Count I, Volkswagen and Bosch are RICO co-conspirators.  The Bosch-Volkswagen conspiracy undertook a fraudulent scheme to create a defeat device and to install it in Affected Vehicles that were sold in the United States and elsewhere through the use of false and misleading statements and omissions relating to the qualities of the emissions controls installed in those vehicles through the use of the U.S. Mails, and interstate and international wire, radio and television transmissions.

101.  At all relevant times and as described above, Defendants carried out their scheme to defraud Plaintiff and other members of the Classes, in connection with the conduct of an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

102.  The Enterprise consisted of the following persons, and others presently unknown, who constitute an "association-in-fact enterprise" within the meaning of RICO and who collectively constitute the "Fraudulent 'CleanDiesel' Enterprise" or "Enterprise":

(1)  Volkswagen USA;

(2)  Volkswagen AG; and

(3)  Bosch.

103.   The Fraudulent "CleanDiesel" Enterprise, whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of persons associated together for the common purpose of selling the Affected Vehicles that the members of the Enterprise knew could not provide the results promised to consumers.

104.   The Fraudulent "CleanDiesel" Enterprise was formed in 2007 or earlier and continued to at least 2015, if not to this day.  That RICO Enterprise engaged in a pattern of racketeering activity by placing the Affected Vehicles into commerce over a seven year period from 2008 to 2015, collecting tens of billions of dollars of illicit profits as a result.

105.   The Fraudulent "CleanDiesel" Enterprise is separate and distinct from the pattern of racketeering activity.  The Enterprise is an ongoing organization or group and exists to advance the interests of the individual entities that comprise its membership, *i.e.*, selling the Affected Vehicles described above.  From 2008 through 2015, the Fraudulent "CleanDiesel" Enterprise members all served the common purpose of shipping and selling as many fraudulent "CleanDiesel" vehicles as possible to the United States, therein maximizing their own profits and revenues and sharing the more than $30 billion in illicit gains derived from deceived and defrauded consumers.   Each member of the Fraudulent

"CleanDiesel" Enterprise benefited from the common purpose:  Volkswagen sold more Affected Vehicles, and received more for those vehicles than they otherwise would have, had the Affected Vehicles been truthfully advertised, marketed and labeled; thus, Bosch was able to sell to Volkswagen more defeat device software to be installed in the Affected Vehicles.

106.  The Fraudulent "CleanDiesel" Enterprise also exists for the legitimate purpose of selling vehicles with software that does not allow those vehicles to evade emissions standards.  It operates within a framework that includes the sale of other consumer goods that are not infected with fraud.  Each member of the Enterprise performs a role in the group consistent with its structure that furthers the activities of the Fraudulent "CleanDiesel" Enterprise in connection with the Enterprise members' sale of EPA-compliant vehicles to consumers.

107.  Alternatively, Bosch and Volkswagen AG are RICO co-conspirators. The Bosch-Volkswagen AG conspiracy undertook a fraudulent scheme to create a defeat device and to install it in Affected Vehicles that were sold in the United States through Volkswagen USA and elsewhere through the use of false and misleading statements and omissions relating to the qualities of the emissions controls installed in those vehicles through the use of the U.S. Mails, and interstate and international wire, radio and television transmissions.

108.   At all relevant times and as described above, Defendants carried out their scheme to defraud Plaintiff and other members of the Classes, in connection with the conduct of an alternative "enterprise" within the meaning of 18 U.S.C. § 1961(4).

109.   The alternative Enterprise consisted of Volkswagen USA.

110.   Through the conduct of the Enterprise or alternative Enterprise, Defendants undertook a fraudulent scheme to sell the Affected Vehicles based upon the false and misleading misrepresentations and omissions set forth herein.

111.   Through this scheme, Defendants and others agreed to utilize the false and misleading representations and omissions relating to the Affected Vehicles in a conscious and deliberate effort to sell products at a premium price that, in fact, provided no benefit whatsoever to the purchaser and/or user of the products. Alternatively, the Affected Vehicles sold through the Fraudulent "CleanDiesel" Enterprise or Volkswagen USA Enterprise had significantly less value than consumers paid for them because the efficacy claims made were fraudulent and the products did not have the possibility of providing the promised results.

112.   As is set forth above, Bosch and Volkswagen knowingly participated in the formulation and manufacture of the defeat device software, as well as the false marketing materials used to sell the Affected Vehicles.

113.   At all times relevant to this case, Defendants were all willing and deliberate participants in the Enterprise or alternative Enterprise.

114.   The Enterprise and alternative Enterprise were, at all relevant times, a continuing unit functioning with a common purpose of selling Affected Vehicles through the use of the false and misleading representations and omissions described above, and those omissions identified below, in order to increase sale of the Affected Vehicles and thereby increase Defendants' profits.

115.   In furtherance of the scheme, Volkswagen, facilitated by and in concert with Bosch, engaged in thousands of acts of mail fraud and wire fraud, each of which constitute "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

116.   Those acts of mail fraud and wire fraud include generally distributing the false and misleading marketing materials described herein via mail, television, radio, and the Internet to members of the public as well as communicating among themselves with respect to the scheme via interstate and international email and telephone with the common purpose of selling the Affected Vehicles to an unsuspecting public based upon the fraudulent and deceptive representations and omissions described above.

117. In addition to the foregoing, each download or view of one of Volkswagen's advertisements and videos on the Internet constituted a separate offense of wire fraud.

118. As a result of the foregoing, Plaintiff and the Classes have been injured in their business and/or property in that they paid for Affected Vehicles that did not, and could not, provide the benefits promised in the advertisements and other promotional materials associated with the products.  Plaintiff' out-of-pocket losses are a direct result of the predicate acts described above.  The Volkswagen Defendants' numerous false and misleading statements (and marketing and advertisements containing omissions) sent via the U.S. mail and interstate wires were directed to Plaintiff and the members of the proposed Class and Subclasses, and were relied on by Plaintiff and/or the members of the proposed Class and Subclasses.  Plaintiff would not have incurred such losses but for the predicate acts described above.  Absent Bosch's facilitation and the Volkswagen Defendants' numerous false and misleading statements (and marketing and advertising containing omissions) sent via the U.S. mail and interstate wires, Plaintiff would not have paid as high a price for the Affected Vehicles as they did, or would not have purchased the Affected Vehicles at all.

## COUNT II
## Fraud by Concealment

119.   Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

120.   Plaintiff brings this claim on behalf of the Nationwide Class.

121.   Volkswagen intentionally concealed and suppressed material facts concerning the quality and character of the Affected Vehicles.  As alleged in this Complaint, Volkswagen engaged in deception to evade federal and state vehicle emissions standards by installing "defeat device" software designed to conceal its vehicles' emissions of the pollutants, which contribute to the creation of ozone and smog.

122.   The software installed in the Affected Vehicles was fraudulently designed to be activated only during emissions testing, such that the vehicles would show far lower emissions during testing than when actually operating on the road.  The result, as Defendants intended, was that vehicles passed emissions testing and received the requisite EPA certifications by way of deliberately-induced false readings.  This deliberate, secret deception reportedly resulted in noxious emissions from these vehicles at rates of forty (40) times permissible levels.

123.   Plaintiff and the other members of the Class reasonably relied upon Volkswagen's false representations when deciding whether to purchase or lease an

Affected Vehicle.  They had no way of knowing that Volkswagen's representations were false and gravely misleading.  As alleged herein, Volkswagen employed extremely sophisticated methods of deception, such that Plaintiff and the other members of the Class did not, and could not, unravel Volkswagen's deception on their own.

124.   Volkswagen concealed and suppressed material facts concerning what is evidently the true culture of Volkswagen – one characterized by an emphasis on profits and sales above compliance with emissions regulations that are meant to protect consumers and the public at large.  Defendants also placed more value on profits than they did on maintaining the trust that Plaintiff and the Class had in Volkswagen's representations about the Affected Vehicles and the culture of the company.  Such crucial representations and omissions have left consumers feeling angered and betrayed.

125.   Necessarily, Volkswagen also took steps to ensure that its employees did not reveal the details of its deception to regulators or consumers, including Plaintiff and Class members.  Volkswagen made such a strategic decision in order to boost the reputations of its vehicles and to falsely assure purchasers and lessors of its vehicles, including certified previously-owned vehicles, that Volkswagen is a reputable manufacturer that complies with applicable law, including federal and

state clean air law and emissions regulations, and that its vehicles likewise comply with applicable law and regulations.

126.   Volkswagen's false representations were material to consumers, both because these misrepresentations concerned the quality of the Affected Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because the misrepresentations played a significant role in assessing the value of the Affected Vehicles.  As Volkswagen well knew, its customers, including Plaintiff and the Class, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

127.   Volkswagen had a duty to disclose the emissions deception in which it engaged with respect to the Affected Vehicles because:  (1) knowledge of the deception and its details were known and accessible only to Volkswagen; (2) Volkswagen had exclusive knowledge as to the implementation and maintenance of its deception; and (3) Volkswagen knew the facts surrounding the deception were unknown to and unable to be reasonably discovered by Plaintiff and other members of the Class.

128.   Volkswagen also had a duty to disclose its sophisticated deception of emissions testing because the company made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with

references to the Affected Vehicles as "CleanDiesel" cars, or cars with clean diesel engines. Such references were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth herein regarding Volkswagen's emissions deception, the actual emissions of its vehicles, its actual philosophy with respect to complying with federal and state clean air law and emissions regulations, and its actual practices with respect to the Affected Vehicles.

129. Having volunteered to provide information to Plaintiff and the Class, Volkswagen had a duty to disclose the entire truth. All of the facts omitted and concealed by Volkswagen are material because they directly affect the value of the Affected Vehicles purchased or leased by Plaintiff and other members of the Class. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, whether that manufacturer is honest about such compliance or non-compliance, and whether the vehicles passed the requisite emissions testing in order to receive EPA certification, are material concerns to a consumer. Volkswagen represented to Plaintiff and other members of the Class that they were purchasing clean diesel vehicles, and that emissions testing had confirmed this. Secretly, however, Volkswagen had thoroughly subverted the entire emissions-testing process.

130. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to expand and protect its profits, and to avoid the perception

that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would damage the brand's image and cost Volkswagen money.   Volkswagen concealed these material facts at the expense of Plaintiff and Class members.

131.  On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiff and the Class by concealing material information regarding the emissions qualities of its referenced vehicles and the company's systematic emissions deception.

132.  Plaintiff and the other members of the Class were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and suppressed facts, in that they would not have purchased or leased the Affected Vehicles from Volkswagen, would not have continued to drive their heavily-polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them.  Plaintiff's and Class members' actions were entirely justified.  Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiff, or the other members of the Class.

133.  As a result of Volkswagen's concealment and suppression of the facts, Plaintiff and the Class have sustained damages.  Plaintiff and the Class have been damaged because they own vehicles that are diminished in value as a result of

Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and because Volkswagen failed to timely disclose the actual emissions qualities and quantities of millions of Volkswagen- and Audi-branded vehicles. Had Plaintiff and the Class been aware of the serious issues generated by Volkswagen's deceptive corporate policies, the emissions deceptions with regard to the Affected Vehicles, or the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiff and Class members who purchased or leased Affected Vehicles would have paid less for those vehicles or would not have purchased or leased them at all.

134.   The value of Plaintiff' and Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions deception, which has greatly tarnished the Volkswagen and Audi brand names attached to Plaintiff' and Class members' vehicles, and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for those vehicles.

135.   Accordingly, Volkswagen is liable to Plaintiff and the other members of the Class for damages in an amount to be proven at trial.

136.   Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class members' rights and the representations that Volkswagen made to them.

These malicious acts were performed solely in order to enrich Volkswagen.  Such egregious conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined to evidence submitted at trial.

137.  Plaintiff pleads this count pursuant to the law of Alabama, where Volkswagen is incorporated, on behalf of all members of the Class.  As necessary, and in the alternative, Plaintiff may allege sub-classes, based on the residences at pertinent times of members of the Class, to allege fraudulent concealment under the laws of states other than New Jersey.

## COUNT III
### Breach of Contract

138.  Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

139.  Plaintiff brings this claim on behalf of the Nationwide Class.

140.  Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the "defeat device," caused Plaintiff and the other Class members to purchase or lease their Affected Vehicles.  Absent those misrepresentations and omissions, Plaintiff and the other members of the Class would not have purchased or leased the Affected Vehicles, would have paid substantially less for the Affected Vehicles, and/or would have purchased or leased less expensive alternative vehicles that did not contain the

CleanDiesel engine system and the "defeat device." Accordingly, Plaintiff and the Class overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

141. Each and every sale or lease of an Affected Vehicle constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff and the other members of the Class defective vehicles and by misrepresenting or failing to disclose the existence of the "defeat device," including information known to Volkswagen that rendered each Affected Vehicle less safe and emissions-compliant, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems and "defeat devices."

142. As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT IV
## Breach of Express Warranty

143. Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

144. Plaintiff brings this claim on behalf of the Nationwide Class.

145. Defendants made numerous representations, descriptions, and promises to Plaintiff and Class members regarding the performance and emission controls of their diesel vehicles.

146. Defendants, however, knew or should have known that their representations, descriptions, and promises were false. Defendants were well aware that they had installed defeat devices in the vehicles they sold to Plaintiff and the other members of the Class.

147. Plaintiff and the Class reasonably relied on Volkswagen's representations in purchasing "clean" diesel vehicles. Those vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiff, those vehicles included devices that caused their emission reduction systems to perform at levels worse than advertised. Those devices are defects. Accordingly, Volkswagen breached its express warranty by providing a product containing defects that were never disclosed to the Plaintiff and the Class.

148. As a direct and proximate result of Volkswagen's false and misleading representations and warranties, Plaintiff and the Class suffered significant damages and seek the relief described below.

## COUNT V
## Breach of Implied Warranties

149. Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

150.   Plaintiff brings this claim on behalf of the Nationwide Class.

151.   Volkswagen made numerous representations, descriptions, and promises to Plaintiff and the other members of the Class regarding the functionality of Volkswagen's "clean" diesel technology.

152.   Plaintiff and Class members reasonably relied on Volkswagen's representations in purchasing the Affected Vehicles.

153.   As set forth throughout this Complaint, Volkswagen knew that its representations, descriptions, and promises regarding its diesel engines were false.

154.   When Plaintiff and the other members of the Class purchased Volkswagen's diesel vehicles, those vehicles did not conform to the promises or affirmations of fact made in Volkswagen's promotional materials, including that the vehicles were designed to meet the most demanding environmental standards. Instead, as alleged herein, those vehicles were designed to cheat those standards, and the Affected Vehicles emitted far higher levels of pollution than promised.

155.   Accordingly, the Affected Vehicles failed to conform to Volkswagen's implied warranty regarding their functionality.

156.   As a direct and proximate result of Volkswagen's false and misleading representations and warranties, Plaintiff and the Class suffered significant injury when Volkswagen sold them cars that, it is now clear, are worth far less than the

price Plaintiff and the Class paid for them.  Accordingly, Plaintiff and the Class

seek the relief described below.

## COUNT VI
## Violation of the Magnuson-Moss Warranty Act
## (15 U.S.C. §§ 2301, *et seq.*)

157.  Plaintiff realleges and incorporates by reference paragraphs 1 through

95 as fully set forth herein.

158.  Plaintiff brings this claim on behalf of the Nationwide Class.

159.  This Court has jurisdiction to decide claims brought under 15 U.S.C. §

2301 by virtue of 28 U.S.C. § 2301(3).

160.  Volkswagen's Affected Vehicles are a "consumer product," as that

term is defined in 15 U.S.C. § 2301(1).

161.  Plaintiff and the other members of the Class are "consumers," as that

term is defined in 15 U.S.C. § 2301(3).

162.  Volkswagen is a "warrantor" and a "supplier," as those terms are

defined in 15 U.S.C. §§ 2301(4) and (5), respectively.

163.  15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer

who is damaged by the failure of a warrantor to comply with an implied warranty.

164.  Volkswagen provided Plaintiff and the other members of the Class

with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

165.   Volkswagen has breached these implied warranties as described in more detail above.   Without limitation, Volkswagen's Affected Vehicles are defective, as described herein, which resulted in the problems and failures also described herein.

166.   By Volkswagen's conduct as described in this Complaint, including Volkswagen's knowledge of the defects inherent in the Affected Vehicles and its action, and inaction, in the face of this knowledge, Volkswagen has failed to comply with its obligations under its written and implied promises, warranties, and representations.

167.   In its capacity as a warrantor, and by the conduct described herein, any attempts by Volkswagen to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective software and supporting systems is null and void.

168.   All jurisdictional prerequisites have been satisfied.

169.   Plaintiff and members of the Class are in privity with Volkswagen in that they purchased the defeat device software from Volkswagen or its agents.

170.   As a result of Volkswagen's breach of implied warranties, Plaintiff and the Nationwide Class members are entitled to revoke their acceptance of the

vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. § 2310.

## COUNT VII
## Unjust Enrichment

171.   Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

172.   Plaintiff brings this claim on behalf of the Nationwide Class.

173.   Plaintiff and members of the Class conferred a benefit on Defendants by, *inter alia*, using (and paying for) their vehicles.

174.   Defendants have retained this benefit, and know of and appreciate this benefit.

175.   Defendants were and continue to be unjustly enriched at the expense of Plaintiff and Class members.

176.   Defendants should be required to disgorge this unjust enrichment.

**B.    Claims Brought on Behalf of the Alabama Subclass**

## Count VII
## Violations of the Alabama Deceptive Trade Practices Act
### ALA. CODE 1975 § 8-19-1 *et seq.*

177.   Plaintiff realleges and incorporates by reference paragraphs 1 through 95 as fully set forth herein.

178.   Plaintiff Valerie Wallace brings this claim on behalf of herself and the Alabama Subclass.

179.   Defendant's misrepresentations, active concealment, and failures to disclose violated the Alabama Deceptive Trade Practices Act ("ADTPA") in the following manner:

a. Defendant misrepresented that its vehicles had characteristics, benefits, qualities or uses that they did not have (Ala. Code § 8-19-5(5));

b. Defendant misrepresented that its vehicles were of a particular standard, quality, and/or grade when they were of another (Ala. Code § 8-19-5(7)); and

c. Defendant advertised its vehicles with an intent not to sell them as advertised (Ala. Code § 8-19-5(9)).

180.   Said conduct is generally and specifically within the meaning of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 et seq. and in the course of business that is prohibited, unfair, and deceptive.

181.   The foregoing acts and omissions of the Defendant were undertaken willfully, intentionally, and knowingly as part of its routine business.

182.   Defendant's misrepresentations and omissions were material to Plaintiff and members of the Alabama Subclass, such that a reasonable person would consider them important in deciding whether to purchase Defendant's vehicles and had Plaintiff and members of the Alabama Subclass known the truth, they would have acted differently.

183.   The conduct described herein has tremendous potential to be repeated where other consumers similarly-situated will be treated with the same unscrupulous, unethical, unfair and deceptive acts and practices.

184.   As a direct and proximate result of the above described practices, Plaintiff and members of the Alabama Subclass sustained damages in an amount to be proven at trial.

## IX.      REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Volkswagen, as follows:

A.      Certification of the proposed Class and Subclasses, including appointment of Plaintiff' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining Volkswagen from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a recall or free replacement program;

D.      Costs, restitution, damages, and disgorgement in an amount to be determined at trial;

E.      Revocation of acceptance;

F.      Damages under the Magnuson-Moss Warranty Act;

G.      Treble and/or punitive damages as permitted by applicable laws;

H.      An order requiring Volkswagen to pay both pre- and post-judgment

interest on any amounts awarded;

I.      An award of costs and attorneys' fees; and

J.      Such other or further relief as may be appropriate.

## X.     DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

Submitted this the 15th day of October, 2015.

s/ Eric J. Artrip
MASTANDO & ARTRIP LLC
Eric J. Artrip (ASB9673I68E)
D. Anthony Mastando (ASB0893X32B)
301 Washington Street, Suite 302
Huntsville, Alabama 35801
Tel.: (256) 532-2222
Fax: (256) 513-7489
Artrip@mastandoartrip.com
Tony@mastandoartrip.com

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Alexander H. Schmidt *(Not admitted to ASB)*
Michael Jaffe *(Not admitted to ASB)*
Malcolm T. Brown *(Not admitted to ASB)*
Correy A. Kamin *(Not admitted to ASB)*
270 Madison Ave.
New York, New York 10016
Tel.: (212) 545-4600
Fax:  (212) 686-0114
Schmidt@whafh.com
Jaffe@whafh.com
Brown@whafh.com
Kamin@whafh.com

**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL:**

**Volkswagen Group of America, Inc.**
**150 South Perry Street**
**Montgomery, Al 36104**

**Volkswagen AG**

**Robert Bosch GmbH**